METROPOLITAN BUILDING COMPANY, A CORPORATION IN THE PROCESS OF VOLUNTARY DISSOLUTION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64913. Filed February 11, 1959.

*James W. Johnston, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioner's income and excess profits taxes for the fiscal year ended June 30, 1953, in the amount of $111,734.72, and for the fiscal year ended June 30, 1954, in the amount of $332,739.39.

The issues to be decided are (1) whether petitioner realized ordinary income or capital gain upon transferring certain leasehold inter-

ests to its lessor for which it received the sum of $137,000 from its own sublessee in September 1952; and (2) whether the petitioner realized ordinary income or capital gain upon transferring certain leasehold interests to a third party in January 1954. It is conceded that, if the transaction referred to in issue (2) constituted a sale of property, then no gain or loss shall be recognized upon it pursuant to section 392(b) of the Internal Revenue Code of 1954.

### FINDINGS OF FACT.

Most of the facts are stipulated and those facts are hereby found as stipulated.

Petitioner is a Washington corporation in the process of voluntary dissolution as of August 27, 1954, and its only office is located in Seattle. The petitioner filed its income and excess profits tax returns on an accrual basis for the fiscal years ended June 30, 1953, and June 30, 1954, with the director of internal revenue for the district of Washington.

On December 3, 1907, by assignment from the original lessee, petitioner became the lessee of the Metropolitan Tract, an area of approximately 4 city blocks in downtown Seattle, under a lease, hereinafter referred to as the Metropolitan Tract Lease, which was to expire November 1, 1954, with the State of Washington, acting by and through the board of regents of the University of Washington, the lessor, and hereinafter referred to as the University. For the last 12 years of the lease period the lease provided that the rental should be at the rate of $140,000 per annum.

Petitioner caused 5 office buildings and other buildings and improvements to be erected on the Metropolitan Tract and subleased office and other space to numerous tenants. During its tenure under the Metropolitan Tract Lease and until January 15, 1954, the principal business conducted by petitioner was the operation and management of the office buildings on the leased premises. Petitioner's Metropolitan Tract leasehold interests were properties used in its trade or business.

### Issue 1.

In the year 1922 petitioner subleased, for a term ending October 31, 1954, the major part of a city block in the Metropolitan Tract to a tenant for the purpose of constructing a hotel building thereon. Thereafter the Olympic Hotel was constructed on such premises pursuant to the sublease, hereinafter referred to as the Olympic Hotel Sublease. In the year 1936 Olympic, Inc., a Delaware corporation, became the sublessee under the Olympic Hotel Sublease. The annual rent payable to petitioner under this sublease was $25,000 plus a "just proportion" of the ad valorem personal property taxes assessed on the

petitioner's Metropolitan Tract leasehold interest. For the 2 years prior to the transfer discussed below, the share of these taxes contributed by Olympic, Inc., was approximately $15,000 per year.

During the year 1952, the University received a number of proposals from various hotel operators to lease the Olympic Hotel. All of these proposals, except that of Olympic, Inc., contemplated a lease commencing November 1, 1954, the date upon which the Metropolitan Tract Lease would expire. Olympic, Inc., proposed that it, at no cost or expense to the University, would procure from petitioner a release of all of petitioner's right, title, and interest in and to the Olympic Hotel property and would thereupon take a new lease directly from the University for a term of approximately 22 years commencing in 1952. Olympic, Inc., was in a favorable bargaining position, in competition with the other interested hotel operators who were negotiating for the hotel lease, due to the fact that Olympic, Inc., was already occupying and operating the property. No other operator could enter into business arrangements to become effective sooner than November 1954 upon expiration of the existing sublease with petitioner. The University, having considered all the various proposals, was favorably disposed to that of Olympic, Inc., because it seemed likely to produce more revenue. At the University's request [1] and pursuant to negotiations among petitioner's president, Andrew Steers, a representative of the University, Arthur T. Lee, and Olympic, Inc.'s representative, John Garvin, the petitioner, on September 8, 1952, conveyed and released to the University all of its interests in that portion of the Metropolitan Tract leasehold upon which the Olympic Hotel was located, including all buildings and improvements thereon, petitioner's Olympic Hotel sublease, and its rights as sublessor thereunder. In consideration of that transfer Olympic, Inc., paid petitioner the sum of $137,000. According to petitioner, the sum of that payment was computed, approximately, at $53,000 for ground rent, covering the unexpired term of the lease, approximately 2 years and 2 months, at an annual rental of $25,000; $44,000 for real estate and property taxes for the remaining term of the sublease; and $40,000 for income taxes. As was contemplated by Olympic, Inc., and the University, the transfer

---

[1] Letter from University to petitioner, dated August 18, 1952:

"Olympic Inc. has submitted to the Board of Regents of the University of Washington a written proposal to lease that part of the Metropolitan Tract occupied by the Olympic Hotel for a term of years commencing immediately. This offer is predicated upon Olympic Inc. obtaining from your company a satisfactory instrument of release of your rights as lessee of the area affected, and it is our understanding that for such release you are to be tendered the full amount of the ground rental that would accrue to you on the sub-lease which it holds from you until the end of the term, October 31, 1954.

"Your partial release to the University would be on the basis that the terms and conditions of your existing lease on the remaining area of the tract would be unchanged, and that no reduction in the reserved rent would result therefrom.

"Since the Board of regents feels that the proposal of Olympic Inc. is an advantageous one for the University of Washington, we respectfully request your favorable consideration."

and release were made without cost to the University and the rental payments due from petitioner to the University on the Metropolitan Tract continued at the same annual rate as before the transfer.

The negotiations between Steers and Garvin were substantially confined to the determination of the price for which petitioner would be willing to release the hotel property. Steers advised Garvin that petitioner could not enter into any transaction with Olympic, Inc., concerning the Olympic Hotel property but could only deal with University.

In the negotiations leading to this transaction and the considerations given the business aspects and tax consequences thereof, petitioner consulted with and was advised by its tax advisors, an accounting firm and a legal firm.

On September 8, 1952, the University accepted Olympic, Inc.'s offer and leased to it the Olympic Hotel premises for a term of 22 years beginning on September 10, 1952. Under said lease the amount of rent to be paid by Olympic, Inc., as lessee, to the University, as lessor, during the period beginning September 10, 1952, and ending October 31, 1954, was the sum of $625,000. In addition, Olympic, Inc., agreed to expend the sum of $1,225,000 to modernize and improve the hotel within the 4-year period commencing September 10, 1952.

The area occupied by the Olympic Hotel Sublease constituted 11.62 per cent of the total land area covered by the Metropolitan Tract Lease prior to September 8, 1952.

In its return for the fiscal year ended June 30, 1953, petitioner reported the receipt of the $137,000 from Olympic, Inc., as capital gain. The respondent determined that receipt of the payment by petitioner constituted ordinary income to it.

## Issue 2.

Following extended negotiations between the University and various prospective lessees, including petitioner, on July 18, 1953, the University entered into a lease with University Properties, Inc., a Washington corporation, whereby the University leased the Metropolitan Tract, excluding the portion then occupied by the Olympic Hotel and the Metropolitan Theater, to University Properties, Inc., for a term of 35 years commencing immediately upon the expiration of petitioner's Metropolitan Tract Lease on November 1, 1954. University Properties, Inc., is a private corporation having no connection with University.

After the execution of the lease dated July 18, 1953, between the University and University Properties, Inc., both parties to that lease deemed it advisable for University Properties, Inc., to obtain possession of the Metropolitan Tract as soon as possible so that University Properties, Inc., would be in a better position to negotiate promptly

with subtenants with respect to the extension of their tenancies beyond November 1, 1954, including necessary arrangements with respect to improvements and alterations of tenant space, to forestall the movement of subtenants to other buildings outside the Metropolitan Tract, and to begin promptly the necessary planning of the extensive building modernization program contemplated by the new lease. Further, University Properties, Inc., would thereby obtain access to the extensive rental records, building plans, and other data in connection with the Metropolitan Tract and the subtenants thereof which were held by petitioner.

Pursuant to authority granted by the University on October 31, 1953, and prior to the execution of the purchase and sale agreement mentioned below, University Properties, Inc., attempted to acquire the stock of petitioner, but was unsuccessful.

On January 7, 1954, petitioner entered into a purchase and sale agreement with Rostev Realty Corporation, of New York, hereinafter referred to as Rostev, whereunder petitioner agreed to sell the Metropolitan Tract Lease including all subleases, rental agreements, and agreements for occupancy, for use of the buildings, rooms, or other space within the area of the leasehold to Rostev together with all furnishings, fixtures, equipment, supplies, and other miscellaneous property used in connection with the operation of the buildings on the tract. Rostev agreed to assume and perform petitioner's obligations accruing after January 1, 1954, under the subleases and other agreements referred to above.

Pursuant to this agreement, on January 15, 1954, petitioner assigned and transferred the Metropolitan Tract Lease together with the other property covered by the agreement to Rostev. In consideration of this transfer, petitioner received from Rostev the net amount of $1,083,027. Petitioner further received $9,778.50 in consideration of the transfer of the furniture, fixtures, and other tangible personal property.

Immediately after acquiring Metropolitan Tract Lease from petitioner, Rostev sublet the entire tract then covered thereby to University Properties, Inc.; the latter immediately assumed possession thereof and took over the management and operation of the office buildings thereon.

For petitioner's fiscal year ended June 30, 1953, the last full taxable year prior to the effective date of its agreement with Rostev on January 7, 1954, and its assignment of lease and bill of sale dated January 15, 1954, petitioner reported gross rentals received in the amount of $2,465,195 and gross income for the year of $2,739,902.28. After deducting the expenses and costs of operations amounting to $1,464,703.73, petitioner reported net income for the year of $1,275,198.55.

The petitioner's estimate of "lease net income" to be derived from the operation of the Metropolitan Tract under the Metropolitan Tract Lease (exclusive of the Olympic Hotel property which had been previously released) for the 10 months' period January 1, 1954, through October 31, 1954, which was prepared by petitioner and furnished to Rostev during the negotiations which led to the execution of the purchase and sale agreement, was in the amount of $1,236,300.

Neither petitioner nor any stockholder of petitioner has at any time held any interest direct or indirect in Rostev or University Properties, Inc.

The petitioner reported the gain it computed on the transfer to Rostev as capital gain. The respondent determined that the net amount received by petitioner from Rostev was "essentially a payment of rents due the lessee from the sublessees" and, therefore, ordinary income.

Respondent concedes that the amount realized from the transfer of the furniture and fixtures, and other miscellaneous property, was realized on the sale of property. Respondent also concedes that certain securities as set forth in the stipulation were sold within the fiscal year ended June 30, 1954. Therefore, the gain therefrom shall not be recognized pursuant to section 392(b) of the Internal Revenue Code of 1954.

OPINION.

### Issue 1.

Petitioner contends that the assignment of that portion of the Metropolitan Tract leasehold on which was situated the Olympic Hotel was a sale of property, and that pursuant to section 117(j) of the Internal Revenue Code of 1939 [2] the amount received should be treated as gain from the sale or exchange of a capital asset held for more than 6 months. *McCue Bros. & Drummond, Inc.*, 19 T.C. 667 (1953); *Louis W. Ray*, 18 T.C. 438 (1952), affd. 210 F. 2d 390 (C.A. 5, 1954); *Isadore Golonsky*, 16 T.C. 1450 (1951), affd. 200 F. 2d 72 (C.A. 3, 1952); *Walter H. Sutliff*, 46 B.T.A. 446 (1942).

Respondent contends that no sale occurred, that the amount received by the petitioner was essentially a substitute payment for rent and other payments that the petitioner would have received under the sublease, had it not been canceled, and is, therefore, ordinary income. *Hort* v. *Commissioner*, 313 U.S. 28 (1941), affirming 112 F. 2d 167 (C.A. 2, 1940), affirming 39 B.T.A. 922 (1939); *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958); *General Artists Corporation*, 17 T.C. 1517 (1952), affd. 205 F. 2d 360 (C.A. 2, 1953); Rev. Rul. 129, 1952–2 C.B. 97.

---

[2] All references to sections are to the Internal Revenue Code of 1939, unless otherwise indicated.

We agree with the respondent.

Petitioner relies on cases which hold that a sale or exchange of property occurs where a lessee transfers either a lease or other substantial property rights to the lessor or to a third party, and that the realized gain is capital gain. *McCue Bros. & Drummond, Inc., Louis W. Ray, Isadore Golonsky,* and *Walter H. Sutliff,* all *supra.* Those cases do not aid the petitioner here. It is true that in the instant case, the formal transfer to the lessor of the portion of the leasehold interest burdened with the sublease is similar to the transfers in the cited cases, and the petitioner suggests that that transfer is the essence of the transaction, and constitutes a sale of property within the meaning of section 117(j).[3] In substance, however, the transaction in the instant case encompasses more than the formal transfer of the burdened leasehold to the lessor. The transaction involved three parties, petitioner, the University, and Olympic, Inc. Olympic, Inc., wanted a long-term lease of the hotel premises from the University to take effect in possession immediately. Petitioner's leasehold interest in the hotel premises which had over 2 years to run precluded that possibility. Therefore, Olympic, Inc., was willing to compensate petitioner for transferring and releasing all of its right and interest in the hotel property, at no cost to the University. The purpose of the transaction was not only to free the property from petitioner's leasehold interest but also to secure a cancellation of the sublease. The underlying property interest which petitioner transferred was, as the petitioner contends, that portion of the Metropolitan Tract leasehold upon which the Olympic Hotel was situated. But the value of that interest to the petitioner was in the sublease, because the sublease was the source of petitioner's income, in the form of rental payments, from that portion of the leasehold transferred. Further, the underlying leasehold had no further significant income-producing potentiality, aside from the sublease, for by its terms it would expire only 1 day after the sublease would. After negotiations, the entire consideration for the transfer and release of petitioner's interests in the leasehold, the sum of $137,000, was paid by the petitioner's sublessee to petitioner. This sum was paid to compensate the petitioner for the rental income and

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not * * *.

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business * * * exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *

property taxes it would have received had the sublease remained in effect, and increased income taxes resulting from the receipt of such a sum in 1 year. Of the total amount of $137,000, approximately $97,000 was received by petitioner in lieu of the amounts it would have received under the sublease, had it remained in effect. While the transaction took the form of a transfer of the lease to the University, in substance, at least, the amount of approximately $97,000 was received by petitioner from its sublessee for cancellation of the sublease. Under these circumstances, the principle set forth in *Hort* v. *Commissioner, supra,* is applicable, and this amount is taxable as ordinary income. See *General Artists Corporation, supra.*

The petitioner relies on *Walter H. Sutliff, supra,* where the taxpayer, the lessee-sublessor, transferred his entire interest to the new owner of the fee. However, he did not receive payments from his tenant for cancellation of the sublease, and the sublease was not canceled. The case is similar to the instant case only in that the taxpayer there, as here, transferred and released his entire interest in the property the subject of the transaction. However, the principle set forth in *Hort* v. *Commissioner, supra,* is applicable upon a taxpayer canceling a sublease and receiving payment from his tenant therefor, and cannot be avoided merely by a simultaneous assignment of the underlying leasehold interest. A holding to the contrary would do violence to that principle, because the fact that the underlying leasehold interest happened to be transferred at precisely the same time does not in any way change the nature of the payments received for cancellation of the sublease. As was stated by the Supreme Court in the *Hort* case, 313 U.S. at 32—

The cancellation of the lease involved nothing more than relinquishment of the right to future rental payments in return for a present substitute payment and possession of the leased premises.

It is true that in the instant case, petitioner received only a "present substitute payment" for it did not receive "in return * * * possession of the leased premises." Instead, by assigning the underlying lease, petitioner gave up the potential right to possession it had in the property. Amounts received by petitioner for the transfer of the leasehold interest, as distinguished from cancellation of the sublease, would be treated as an amount received from the sale or exchange of a capital asset. Sec. 117(j); *Isadore Golonsky, supra.* However, petitioner did not receive any amount for the assignment of the lease which was not attributable to the value of the sublease. The sublease was the source of income from the leasehold, and its term was of the same duration as the underlying leasehold, within 1 day. Further, the parties attributed no value to the underlying lease, distinct from the value of

the sublease. The difference between the amount received, $137,000, and the amount received in lieu of rental payments and property taxes, approximately $97,000, which would have been received pursuant to the sublease, or $40,000 was, according to petitioner's president, computed on the basis of the income taxes resulting to petitioner from the amount of gain upon the transaction. Amounts received for income taxes come within the statutory concept of gross income as set forth in section 22(a). Olympic, Inc., was willing to pay the entire consideration, $137,000, for the release of all of petitioner's interest, including the portion of the leasehold transferred. But this fact alone does not prove that the leasehold transferred had any value distinct from that of the sublease. The petitioner has failed to prove that any part of the amount received, $137,000, was solely for the transfer of the underlying leasehold, as distinct from the amount received for the cancellation of the sublease.

Petitioner has failed to prove that the respondent erred in his determination that the entire amount received was ordinary income, and the respondent's determination is sustained.

### Issue 2.

The petitioner contends that the transfer of the Metropolitan Tract Lease, including the subleases and other property, constitute a sale or exchange of property and that the gain therefrom should not be recognized pursuant to section 392(b) of the Internal Revenue Code of 1954. *McCue Bros. & Drummond, Inc., Louis W. Ray, Isadore Golonsky*, and *Walter H. Sutliff*, all *supra.*

Respondent contends that because the lease would expire at the end of 10 months and because petitioner would have realized ordinary income from the subleases had it remained the sublessor, petitioner has made an assignment of the future income, not a sale of property. *Commissioner* v. *P. G. Lake, Inc., supra; Helvering* v. *Horst*, 311 U.S. 112 (1940) ; *Commissioner* v. *Starr Brothers, Inc.*, 204 F. 2d 673 (C.A. 2, 1953), reversing 18 T.C. 149 (1952) ; *Commissioner* v. *Pittston Co.*, 252 F. 2d 344 (C. A. 2, 1958), reversing 26 T. C. 967 (1956) ; see Rev. Rul. 56–531, 1956–2 C.B. 983.

We agree with the petitioner.

It is established law that the transfer of a leasehold interest, even if burdened with subleases by the lessee to a third party, constitutes a sale of property. *Isadore Golonsky*, and *Walter H. Sutliff*, both *supra.* Further, analogous transactions involving the transfer of other substantial property interests have been held to constitute sales or exchanges or other dispositions of property. *McCue Bros. & Drummond, Inc., supra; Louis W. Ray, supra; Blair* v. *Commissioner,*

300 U.S. 5 (1937); *Bell's Estate* v. *Commissioner*, 137 F. 2d 454 (C. A. 8, 1943).

Respondent, however, contends that the recent Supreme Court decision in *Commissioner* v. *P. G. Lake, Inc., supra*, suggests a different result. As we understand that case, it does not do so. In that case there was neither a transfer of a taxpayer's entire interest nor was there a transfer of a portion of that interest having a remaining life equal to the life of the interest retained. Instead the taxpayer had transferred merely an interest measured in a dollar amount and dependent on approximately 3 years of oil production. Presumably, if a portion of the entire interest had been transferred for the entire life of that interest, the respondent would not have attempted to tax the gain as ordinary income. See I.T. 4003, 1950–1 C.B. 10, 11. The case is clearly distinguishable. Respondent also relies on *Commissioner* v. *Pittston Co., supra*, but in that case the Second Circuit, after reviewing decisions in the area, distinguished between the "naked contract rights," which it found to have been terminated in that case, and "substantial" property rights. The lease in question is clearly a substantial property right. Nor do the principles enunciated in *Helvering* v. *Horst, supra*, aid the respondent here. In distinguishing *Blair* v. *Commissioner, supra*, the Court said of that case:

Unlike income thus derived from an obligation to pay interest or compensation, the income of the trust was regarded as no more the income of the donor than would be the rent from a lease or a crop raised on a farm after the leasehold or the farm had been given away. *Blair* v. *Commissioner, supra*, 300 U.S. 12, 13, and cases cited.

It is of no legal significance that the lease had only 10 months left to run at the time of the assignment. Nor does the fact that the amount received was based upon the anticipated return from the subleases affect the result; the earning power of the income-producing property will almost always be a factor determining its fair market value.

We have carefully considered the other cases relied upon by respondent but find that the principles are not applicable here.

The respondent erred in his determination that the gain realized by the petitioner upon the assignment of the Metropolitan Tract Lease to Rostev was ordinary income. The gain was realized from the sale or exchange of property and shall not be recognized pursuant to section 392(b).

*Decision will be entered under Rule 50.*