SAMUEL D. MILLER AND MOLLIE K. MILLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7172–65.   Filed August 8, 1967.

*John Kennedy Lynch,* for the petitioners.
*Larry L. Nameroff,* for the respondent.

HOYT, *Judge:* Respondent determined a deficiency of $8,121.32 in the joint income tax of petitioners for the taxable year ended December 31, 1961. The only question for decision is whether an amount of money received in consideration of terminating a sublease agreement when accompanied by an assignment of the prime lease constitutes ordinary income to the lessee-sublessor or whether capital gains treatment is proper.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly and adopted as our findings.

Petitioners Samuel D. Miller and Mollie K. Miller are husband and wife and their legal residence at the time the petition was filed herein was Toledo, Ohio. Their joint return for the year involved was filed with the district director of internal revenue, Cleveland, Ohio. Mollie is a party herein only by reason of having filed a joint return with her husband, Samuel D. Miller, and the latter will hereinafter be referred to as petitioner.

Petitioner is a certified public accountant and an attorney. In 1958 petitioner became interested in a parcel of real estate located at Wheeling and Starr Avenue, Oregon, Ohio. The land was improved by a building and parking area used for supermarket purposes. This parcel of improved real estate was owned by Robert E. Lehmann and had been initially leased to Save-Way Super Markets, Inc., on June 1, 1955, for a term of 15 years at a monthly rental of $1,650, with an option to renew the lease for an additional 15-year period upon the

# 650

same terms. The lease did not contain a clause requiring the lessor's permission for an assignment of the lease or a sublease. This lease, hereinafter referred to as the prime lease, had been assigned by Save-Way Super Markets, Inc., to Melvin B. Lewis, on October 1, 1956.

In November of 1958 petitioner began negotiations looking toward the purchase of the supermarket property. He was interested in acquiring the real estate rather than the grocery business operation and so he also sought to locate a purchaser for the business.

On December 26, 1958, petitioner obtained an option agreement from Lewis, exercisable before February 10, 1959, to purchase the grocery supermarket business being conducted on the leased property. The option, as subsequently amended by agreement of the parties, covered the entire going concern, including goodwill, furniture, fixtures, inventory, and the leasehold.

The following day, December 27, 1958, petitioner in turn granted an option to Seaway Food Town, Inc., to purchase the going-concern supermarket grocery business and assets, except for the leasehold, exerciseable before January 12, 1959. By the terms of this option petitioner agreed to sublease the supermarket real estate to Seaway for the term of the prime lease at an increased monthly rental.

Petitioner exercised his option with Lewis (on behalf of Seaway) with Seaway becoming the new owner of and providing the consideration for transfer to it of the supermarket business and assets formerly owned by Lewis, without the leasehold. On January 10, 1959, Lewis assigned his interest in the prime lease of the property to petitioner in conjunction with the sales transaction. The property was simultaneously subleased by petitioner to Seaway for a period of 12 years with a renewal option for an additional 15 years, the term remaining under the prime lease. The sublease provided for monthly rental payments of $2,386.25 for the first 6 years, $1,885.35 for the second 6 years, and $1,745 for the 15-year optional renewal period, all in accordance with the terms of the December 27, 1958, option agreement between petitioner and Seaway.

Petitioner proceeded thereafter to collect the agreed rent from Seaway and in turn pay the rent due the owner of the property, Robert E. Lehmann. Subsequently, about 2 years later, Seaway received funds from a public offering of stock and began negotiations with petitioner to acquire the prime lease. Petitioner's wife had been in poor health and the Millers had left Ohio to spend part of the time in Florida. Petitioner decided to retire from his accounting practice and felt that it was an opportune time to sell the leasehold. On January 27, 1961, petitioner and Seaway entered into an agreement canceling and terminating the sublease and petitioner, by separate document, assigned the prime lease to Seaway. Seaway paid petitioner

$32,000 in consideration for such assignment, cancellation, and termination, all of which was paid in 1961. In the assignment agreement Seaway agreed to assume all of petitioner's obligations under the prime lease.

Petitioner reported the $32,000 received in connection with the assignment to Seaway of the lease in Schedule D of his income tax return for 1961 as proceeds of a sale of an asset held for more than 6 months, resulting in a long-term capital gain. Respondent determined that the "$32,000.00 constitutes ordinary income and thus does not represent nor qualify as a long-term capital gain as defined by section 1222 of the Internal Revenue Code of 1954." [1]

OPINION

It is petitioner's position that the $32,000 payment should be treated as gain from the sale or exchange of a capital asset held for more than 6 months. See sec. 1222(3). Respondent contends that no sale occurred, that the amount received by the petitioner was essentially a substitute payment for future rents the petitioner would have received under the sublease, had it not been canceled, and is, therefore, ordinary income under the doctrine of *Hort* v. *Commissioner*, 313 U.S. 28 (1941).

Capital gains treatment is only obtainable if the object of a given transaction is a "capital asset" within the meaning of the Code, and, if there is a "sale or exchange" of the property. See secs. 1221, 1222, and 1231. Practical and logical interpretation and application of these terms is extremely difficult. See, for example, *Commissioner* v. *Ferrer*, 304 F. 2d 125 (C.A. 2, 1962), affirming in part and reversing and remanding 35 T.C. 617 (1961). See also our most recent discussion of the issue in *King Broadcasting Co.*, 48 T.C. 542 (1967).

It is well settled that leasehold interests qualify as "capital assets." *Commissioner* v. *McCue Bros. & Drummond, Inc.*, 210 F. 2d 752 (C.A. 2, 1954), affirming 19 T.C. 667 (1953), certiorari denied 348 U.S. 829 (1954); *Louis W. Ray*, 18 T.C. 438 (1952), affd. 210 F. 2d 390 (C.A. 5, 1954), certiorari denied 348 U.S. 829 (1954); *Commissioner* v. *Golonsky*, 200 F. 2d 72 (C.A. 3, 1952), affirming 16 T.C. 1450 (1951), certiorari denied 345 U.S. 939 (1953). The heart of the controversy here, therefore, is whether petitioner "sold or exchanged" his leasehold interest.

Respondent relies upon *Hort* v. *Commissioner, supra*, to support his contention that there was no "sale or exchange." The Supreme Court held in *Hort* that where a lessor receives payment in consideration for the release of his lessee from all obligations under the lease, the lessor has not given up any interest in the property and the payment is

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

not connected with a "sale or exchange" but is rather a substitute for future rent. It is argued that petitioner here was essentially a lessor in the transaction receiving a payment for cancellation of a lease and that the only thing conveyed was the sublease.

The facts that petitioner owned only a leasehold interest and was actually a lessee-sublessor and Seaway was his sublessee are considered to be of no importance by respondent. He mistakenly regards petitioner as identical to a landlord who owns the real property leased and receives a payment from his tenant to cancel the lease. In this he commits serious error.

It has long been settled that a lessee is considered to have "sold or exchanged" a capital asset when he transfers all of his interest in the property to a third party for a sum of money. *Walter H. Sutliff*, 46 B.T.A. 446 (1942). Moreover, it was first held and later codified by Congress that a lump-sum payment received by a lessee from his lessor for cancellation of the lease was the product of a "sale or exchange" and therefore entitled to capital gains treatment. *Commissioner* v. *Golonsky, supra;* Sec. 1241. As we observed in *Sutliff, supra,* the *Hort* case relied on by respondent "was grounded on the uncontroverted and apparently conceded fact that the taxpayer had canceled a lease on real estate *which he owned in fee.*" (Emphasis supplied.) Here petitioner was not the owner of the real property but merely held a leasehold which was transferred to the purchaser, Seaway. By the cancellation of the sublease *and the assignment of the prime lease* petitioner completely divested himself of any interest in the property. Obviously a cancellation of the sublease standing alone would not have accomplished the business purpose of the parties to the transaction and the factual distinctions clearly distinguish the instant case from *Hort.*

Petitioner places primary reliance upon *Metropolitan Building Co.* v. *Commissioner*, 282 F. 2d 592 (C.A. 9, 1960), reversing 31 T.C. 971 (1959). In that case the prime lessor and the sublessee of business property sought to remove the intervening interest of the taxpayer, the lessee-sublessor. The taxpayer agreed to release to the lessor all his right and interest in the leasehold in consideration of a sum of money paid by the sublessee. Relying on *Hort*, we held that the payment was in lieu of future rents under the sublease. On appeal we were reversed and it was held that the substance of the transaction was the transfer of the leasehold from the lessee to the lessor and there was a sale or exchange of a capital asset. The Court of Appeals rejected our conclusion that the facts there were distinguishable from those in *Golonsky* and distinguished *Hort* on the ground that the lessee who paid the taxpayer for cancellation of its lease in that case did not acquire any interest of its lessor but simply compromised and liquidated its

rental obligation under the lease. The amount received by the lessor in *Hort* was in lieu of the rentals which the lessee was obligated to pay.

In *Metropolitan Building* the Court of Appeals concluded that the sums paid were to acquire the leasehold interest and not merely to liquidate a right to future income as in *Hort*; there was a disposition by the taxpayer of income-producing property itself. The court observed that it was immaterial that the consideration was paid by a sublessee to the sublessor saying:

It is not the person of the payor which controls the nature of the transaction in our view. Rather, it is the fact that the transaction constituted a bona fide transfer, for a legitimate business purpose, of the leasehold in its entirety. It did not constitute a release or transfer only of the right to future income under the sublease and the business purpose of the transaction would not have been met by such a release.

Respondent does not argue that *Metropolitan* was incorrectly decided by the Court of Appeals or that we should adhere to our earlier views expressed in that case. Rather respondent urges that it is distinguishable because here petitioner sold his sublease rather than the prime lease, and that "the sale of the sublease was in fact a cancellation thereof," whatever that may mean. We reject that argument because here there was a transfer of the prime lease and the simultaneous cancellation of the sublease.

While there are factual distinctions between the instant case and *Metropolitan Building*, they are superficial and insignificant. The substance of the transactions in both cases is very much the same but *Metropolitan* goes a step further in holding that the release of the underlying prime lease to the lessor rather than assignment thereof to the sublessee who paid the consideration was in substance the disposition of income-producing property resulting in capital gains and not ordinary income.

Here, too, the substance of the transaction was the acquisition of petitioner's leasehold interest which still had many years to run. By assignment thereof to Seaway petitioner disposed of his entire interest in the property and the fact that the sublessee provided the consideration therefor and entered into an agreement to cancel the sublease does not alter the inescapable conclusion that a sale of income-producing property occurred. The assignment of the prime lease, not the cancellation of the sublease, effected the business purpose of the parties and the payment was not merely in lieu of future income under the sublease for cancellation thereof.

Long before the Ninth Circuit's reversal in *Metropolitan Building* we decided a series of cases which likewise guide us to our conclusions here. *McCue Bros. & Drummond, Inc.*, 19 T.C. 667 (1953); *Louis W. Ray*, 18 T.C. 438 (1952); *Isadore Golonsky*, 16 T.C. 1450 (1951). All

of these cases were affirmed on appeal and together with our earlier opinion in *Walter H. Sutliff*, 46 B.T.A. 446 (1942), establish the doctrine that where a tenant disposes of his leasehold interest a sale or exchange takes place and any gain realized therefrom is a capital gain.

As our findings of fact here reflect, there was here a simultaneous cancellation of the sublease which completely extinguished all rights of petitioner and Seaway thereunder *and* an assignment by petitioner *to Seaway* of all of his rights under the prime lease. Had there been merely a cancellation of the sublease without the assignment, petitioner would have retained his leasehold interest in the property and realized ordinary income in the form of liquidated rental payments. *Hort* v. *Commissioner*, *supra*. Seaway would have had no further interest of any kind in the property. This is not what transpired nor is it what was desired or intended.

If petitioner had merely sold Seaway the sublease, as respondent argues he did by cancellation thereof, petitioner would still have owned the prime lease and been liable to the owner thereon. Seaway would have had no right to possess or occupy the premises because its sublease had been canceled. It is inconceivable that either petitioner or Seaway would have entered into any transaction in the factual circumstances disclosed by this record without the conveyance of the underlying leasehold owned by petitioner. It was that interest and that interest alone which Seaway desired to acquire, and because he owned it and was willing to convey it to Seaway, petitioner was able to realize the payment in 1961 which gives rise to this litigation. The substance of the transaction for valid and existing business purposes was the sale of petitioner's leasehold to Seaway with the accompanying cancellation of the sublease on which Seaway obviously no longer wished to remain liable to petitioner.

It is apparent to us that the cancellation of Seaway's sublease was desired by or advantageous for Seaway only if petitioner also made a contemporaneous assignment of the prime lease to Seaway. Seaway evidently wanted to continue operating a grocery business on the property, particularly in view of its ownership of the business assets. It was not seeking to pay petitioner off for release of the sublease. Seaway was in a position to remove petitioner's intervening interest due to its acquisition of new funds from a public offering of its stock. Therefore, the assignment of the prime lease to Seaway was the essential element of the transaction.

We place little importance on the fact that the sublease cancellation and the prime lease assignment were effected by separate documents with the $32,000 payment termed consideration for the sublease cancellation. Both of the documents were executed on the same day and we view them as unified components of the same transaction. We are

concerned with the substance not the form. The sublease cancellation was merely supplementary to the attainment of Seaway's business objective. The occurrence of a cancellation should not be determinative where something is transferred, as it was here. See *Isadore Golonsky*, 16 T.C. 1450, affd. 200 F. 2d 72 (C.A. 3, 1952), certiorari denied 345 U.S. 939 (1953).

The $32,000 figure which Seaway agreed to pay petitioner was reached by arm's-length bargaining by unrelated and experienced businessmen considering the overall consequences of the proposed transaction. Obviously the leasehold acquired was of value to Seaway because of its willingness to participate in the two agreements which effected the transaction. Petitioner, because of his personal situation at the time, desired to dispose of it.

After carefully considering all of the evidence of record and the respective arguments of the parties we conclude and hold that the substance of the transaction here was that petitioner received the $32,000 payment for the sale of his leasehold. An incident of the transaction was to remove his intervening sublessor's interest in the property, which was simultaneously canceled by agreement of the parties. The fact that the payor was the party obligated to pay rent under the sublease is not determinative or even significant, absent even a suggestion that it was a sham transaction or anything other than an arm's-length bona fide transaction between knowledgeable businessmen. We follow *Metropolitan Building Co.* v. *Commissioner*, 282 F. 2d 592 (C.A. 9, 1960), reversing 31 T.C. 971 (1959).

We view the separate documents involved as constituting a unified transaction, and thus the payment constituted compensation for Seaway's acquisition of petitioner's leasehold interest in the property. This interest was the only interest that petitioner had in the property and all that was important to the parties. We think it insignificant that the purchaser of the leasehold was the sublessee in the light of our determination that the substance of the transaction was the transfer of the petitioner's leasehold for existing business purposes such as were here involved. As Judge Augustus Hand observed in *McCue Bros. & Drummond, Inc.*, 210 F. 2d at 753, "If it [a leasehold] is sold by the tenant to a third person, the gain derived therefrom is a capital gain, *Sutliff* v. *Commissioner*, 46 B.T.A. 446, and we see no reason why a different result should be reached here."

We conclude and hold that here there was a "sale or exchange" of a capital asset and that the $32,000 received by petitioner in 1961 was capital gain taxable as such, not ordinary income.

Reviewed by the Court.

*Decision will be entered for the petitioners.*